**School Board Powers: Superintendent: Salary and Benefits:** School district powers regarding salary and benefits for superintendent discussed. Authority of Commissioner of Children, Families and Learning discussed. Minn. Stat. §§ 43A.17, 123.33-123.35, 356.24, 356.25, 471.38, 471.665

161b-12
(Cr. Ref. 161b-4, 397)

August 4, 1997

Robert J. Wedl, Commissioner
Minnesota Department of Children,
Families and Learning
550 Cedar Street
St. Paul, MN 55101-2273

Dear Commissioner Wedl:

In a letter to Attorney General Hubert H. Humphrey III, your office noted that "during 1995, the Office of the State Auditor reviewed school superintendent contracts in the metropolitan area. The OSA found in many of the contracts, violations of Minnesota Statutes including violations of the 95 percent compensation cap set forth in Minn. Stat. § 43A.17, subd. 9. Although some of the school districts have amended their contracts to comply with the findings of the OSA, others have challenged the OSA's application of Minnesota law to their particular contracts."

In order to provide guidance to the educational community, our opinion was sought as to whether school districts are authorized to provide certain benefits to superintendents and whether the value of such benefits must be included in determining whether the superintendent's compensation is within the compensation permitted by Minn. Stat. § 43A.17, subd. 9 which provides in pertinent part:

> Subd. 9. Political subdivision compensation limit. The salary and the value of all other forms of compensation of a person employed by a statutory or home rule charter city, county, town, school district, metropolitan or regional agency, or other political subdivision of this state, or employed under section 422A.03, may not exceed 95 percent of the salary of the governor as set under section 15A.082, except as provided in this subdivision. Deferred compensation and payroll allocations to purchase an individual annuity contract for an employee are included in determining the employee's salary. Other forms of compensation which shall be included to determine an employee's total compensation are all other direct and indirect items of compensation which are not specifically excluded by this subdivision. Other forms of compensation which shall not be

included in a determination of an employee's total compensation for the purposes of this subdivision are:

(1)     employee benefits that are also provided for the majority of all other full-time employees of the political subdivision, vacation and sick leave allowances, health and dental insurance, disability insurance, term life insurance, and pension benefits or like benefits the cost of which is borne by the employee or which is not subject to tax as income under the Internal Revenue Code of 1986;

(2)     dues paid to organizations that are of a civic, professional, educational, or governmental nature; and

(3)     reimbursement for actual expenses incurred by the employee which the governing body determines to be directly related to the performance of job responsibilities, including any relocation expenses paid during the initial year of employment.

The value of other forms of compensation shall be the annual cost to the political subdivision for the provision of the compensation.

For purposes of this inquiry five sets of facts were presented with questions as follows:

## FACTS

The superintendents of several school districts receive, on an annual basis, all or a part of their accrued vacation in the form of cash payments. For example, the superintendent of one School District has the following provisions in his contract:

### Basic Work Year

The work year shall be for twelve (12) months, including twenty-eight (28) days of paid vacation annually. All vacation time must be taken within 19 months of the start of the contract year in which it is received or be forfeited. At the Superintendent's option, sixteen (16) of the twenty-eight (28) vacation days may be work days and the Superintendent shall be additionally compensated at the rate of 1/223 for each vacation day worked.

During 1993 and 1994, the superintendent was paid $5,851 and $6,848 respectively in lieu of taking vacation. If these amounts of cashed out vacation were included in the superintendent's salary for the purposes of Minn. Stat. § 43A.17, his salary for these years would have exceeded the 95 percent cap.

The school district believes they have authority to cash out vacation and these amounts are excluded from the "salary" calculation. The school district claims these payments are similar to overtime amounts which are excluded from the calculation under the terms of Minn. Stat. § 43A.17.

Based upon these facts you ask substantially the following questions:

## QUESTION ONE

Does a school district have the statutory authority to convert vacation benefits to cash in situations other than termination of employment?

## OPINION

We answer this question in the affirmative. The situation described is analogous to that addressed in Op. Atty. Gen. 161b-4, May 27, 1980. In that Opinion we concluded that a school district had authority to include in contracts with teachers a provision for a payment based upon unused sick leave and personal business days at the end of the year. We observed there:

> Such a plan is simply a method of providing compensation to teachers for services rendered during the contract period. The fact that the compensation is calculated on the basis of accumulated sick leave and unused business days does not alter its essential character. Accordingly, since a school district may agree to compensate its teachers, it may, in the exercise of its discretion, agree to do so in this manner,

The same reasoning would seem applicable to the situation you present. Thus it is our opinion that districts subject to limits such as that discussed below do possess authority to provide compensation to superintendents for unused vacation days.

## QUESTION TWO

If a school district cashes out accrued vacation in situations other than termination of employment, are such amounts included as salary and the value of

all other forms of compensation under the compensation limitation found in Minn. Stat. § 43A.17?

## OPINION

We answer this question in the affirmative. Minn. Stat. § 43A.17, subd. 1 defines "salary" as:

> .... hourly, monthly, or annual rate of pay including any lump-sum payments and cost-of-living adjustment increases but excluding payments due to overtime worked, shift or equipment differentials, work out of class as required by collective bargaining agreements or plans established under section 43A.18, and back pay on reallocation or other payments related to the hours or conditions under which work is performed rather than to the salary range or rate to which a class is assigned.

In Op. Atty. Gen. 469b, September 14, 1993 we concluded that, while the statute was somewhat ambiguous on this issue, compensation paid for unused vacation at the time of termination should not be considered salary for purposes of the salary cap. We then indicated that such a liquidation of vacation at separation was more analogous to a continuation of salary at the regular rate than to an addition to salary. See also Minn. Stat. § 43A.17, subd. 11 which implies that vacation conversion at termination is more in the nature of severance pay than salary.

Such reasoning would not apply, however, to payment for unused vacation in circumstances of continued employment. Such payments would seem rather to constitute "lump sum payments" included within the above definitions of salary.

It has been suggested that such payments might be considered "overtime" pay, and thus are excluded from salary. However, the concept of overtime in its normal usage relates to hours worked outside of or in addition to, an employee's normal scheduled days or hours of work. See, e.g., Minn. Stat. § 177.25 (work time in excess of 48 hours per week); the American Heritage Dictionary (Second College Edition, 1995) 887 (working hours in addition to those of the regular

schedule). That concept would not apply to additional pay received for working on regularly scheduled work days in lieu of taking vacation. For example, unlike a normal overtime situation, it would be impossible to determine which of the superintendent's normal work days could be considered "overtime" when unused vacation is cashed in. Furthermore, it appears that the conversion of vacation to pay is entirely within the discretion of the superintendent, unlike most overtime arrangements which depend upon the specific direction or request of the employer or supervisor. In effect the superintendent here has been given the option of receiving a higher annual salary in exchange for less paid vacation. Thus we believe that the vacation cash-out payments described should be considered salary for purposes of section 43A.17. This conclusion is further supported by the fact that other statutes expressly exclude vacation cash-out payments in defining "salary" for other purposes. Cf., Minn. Stat. §§ 353.01, subd. 10 and 354.05, subd. 35 (1996) which, in defining "salary" for purposes of public employees and teacher retirement, expressly exclude "unused annual leave" payments and "lump sum annual leave" payments.

Even if liquidated vacation were not considered "salary," however, it would seem clearly to fall within the ambit of "all other forms of compensation" as defined in section 43A.17, subd. 9. That subdivision excludes "vacation and sick leave allowances." However, it does not exclude cash payments received during employment for unused vacation or sick leave. Cf. Minn. Stat. § 43A.17, subd. 11 which excludes from severance pay limitations "payments for accumulated vacation ...."

Thus it is our opinion that payments for unused vacation days in the circumstances described would be included in computing compensation for purposes of the salary cap.

## FACTS

Various school districts offer their superintendents deferred compensation packages. For instance, one school district superintendent's employment contract states the school district "adopted a Deferred Compensation Plan under section 457(f) of the Internal Revenue Code. In accordance with the provisions of that

Plan, the School District shall contribute $15,000 annually to that [deferred compensation] Plan on behalf of the Superintendent...."

For each school year 1993/94 and 1994/95, the district contributed $15,000 on behalf of the superintendent to deferred compensation plans pursuant to the employment contract. Of the $15,000 invested in 1993/94, $5,500 was invested in a "457(f) plan" and $9,500 was invested in a 403(b) plan. Of the $15,000 invested in 1994/95, $7,000 was invested in a 457(f) plan and the remaining $8,000 was invested in a 403(b) plan. When these $15,000 deferred contribution payments were combined with the superintendent's salary, it exceeded the 95 percent cap of Minn. Stat. § 43A.17.

Based upon these facts you ask the following question:

## QUESTION THREE

With the exception of an employer contribution totaling $2,000 permitted by Minn. Stat. § 356.24, subd. 1(a)(4)(ii), does a school district have the statutory authority to make an employer contribution or other non-salary amounts into a superintendent's 403(b), 457(f) or other types of deferred compensation plans?

## OPINION

We are unable to provide a categorical answer upon the facts supplied. Minn. Stat. §§ 356.24 and 356.25 severely restrict the authority of school boards to use public funds to purchase supplemental pension or deferred compensation plans. A supplemental plan is defined as a plan "established, maintained, and operated in addition to a primary pension program for the benefit of the governmental subdivision employees." Minn. Stat. § 356.24, subd. 1 (1996).[1]

That subdivision of the statute outlaws employer contributions to supplemental plans, with six specific exceptions. One such exception found in subdivision 1(5) permits an employer to match an employee contribution of up to $2,000 per year, if provided for in the personnel policy of the public employer. This contribution is permitted in one of two circumstances: (i) if

[1] The next section prohibits establishment of any local pension plan or fund financed from public funds other than a volunteer firefighter's relief association. Minn. Stat. § 356.25 (1996).

it is made to a section 352.96 deferred compensation plan (not applicable to these facts) or (ii) if it is part payment of the premium on a tax-sheltered annuity contract under section 403(b) of the Internal Revenue Code. Minn. Stat. § 356.24, subd. 1(5)(i) and (ii). As applied to these facts, the permissible employer contribution to a 403(b) plan is limited to $2,000, subject to a matching contribution by the employee. We have found no authority, however, to support employer contribution in excess of that amount. Instead, contribution of an amount over this $2,000 if permitted at all, must be considered compensation to the employee deferred at the employee's request. See, Op. Atty. Gen. 59-a-41, February 22, 1984; Minn. Stat. § 123.35, subd. 12 (1996).

The specific details of the Section 457(f) plan referred to are not set out in your letter or the accompanying materials. As we understand 26 U.S.C. § 457(f), it provides that deferred compensation, provided under certain plans of state or local government employers which are not "eligible" for tax deferral under Section 457, is included in taxable income of the recipient "in the first year in which there is no substantial risk of forfeiture of the rights to such compensation." These amounts are subject to a substantial risk of forfeiture if conditioned upon the future performance of substantial services. 26 U.S.C. § 457(f)(3)(B). In the instant case the district states that the superintendent would forfeit all rights to the funds held by the district under the 457(f) plan if the contract is terminated for "cause." However, when the superintendent retires or otherwise terminates employment, the benefits would fully vest.

We are unable to find general statutory authorization for employer contributions to 457(f) plans, which are distinguishable from a section 403(b) annuity contract plan. See 12 U.S.C. 457(f)(2)(B). Furthermore, the only exception contained in Minn. Stat. § 356.24, subd. 1 that appears potentially applicable to such an arrangement is paragraph (a)(4), which permits payments to "a plan that provides solely for severance pay under section 465.72 to a retiring or terminating employee."

Minn. Stat. § 465.72 authorizes payment of severance pay to employees of school districts and imposes limitations thereon. For example, severance payments generally may not exceed the equivalent of one year's pay and must be paid over a period not to exceed five years from retirement or termination. In the case of a "highly compensated employee" as defined in section 465.722, severance pay may not, with certain specified exceptions, exceed six months' pay. See also Minn. Stat. § 43A.17, subd. 11 (1996).

It is possible that a 457(f) plan may be established so as to operate within the authorization for severance pay. To the extent that it is so constructed, it is our view that a district is authorized to provide funds to satisfy its obligations under such a plan.

Thus, it is our view that a school district is authorized to provide funds to a 457(f) plan only to the extent that it is within statutory authority to provide for severance pay and to contribute up to $2,000 to a 403(b) plan.

## QUESTION FOUR

If the school district contributes to the superintendent's 403(b), 457(f) or other types of deferred compensation plan(s), are such amounts salary under Minn. Stat. §43A.17?

## OPINION

The question is answered in the affirmative, with respect to contributions to the 403(b) plan. Minn. Stat. § 43A.17, subd. 9 explicitly provides that "Deferred compensation and payroll allocations to purchase an individual annuity contract for an employee are included in determining the employee's salary."

The plain language of the statute includes as salary, deferred compensation and payroll allocations used to purchase an individual annuity contract such as the 403(b) plan in this case. Up to $2,000 of the contribution may be considered a payment from the employer, as discussed in the answer to Question Three. The remaining contribution would be permitted only as a

payroll allocation. However, this distinction is meaningless for purposes of Minn. Stat. § 43A.17, subd. 9, which specifically includes deferred compensation as well as payroll allocations in determining the employee's salary. Thus, the entire amount of contributions to a section 403(b) plan should be included for purposes of the salary cap calculation. See Op. Atty. Gen. 59a-41, February 22, 1984.

It is suggested that these amounts might be excluded pursuant to Minn. Stat. § 43A.17, subd. 9(1) which excludes from the calculation of total the amount of "pension benefits or like benefits the cost of which is borne by the employee or which is not subject to tax as income under the Internal Revenue Code of 1986." We do not agree. The salary cap is imposed by subdivision 9 upon "salary and the value of all other forms of compensation." The items listed in paragraphs (1), (2) and (3) of that subdivision are excluded from consideration as "other forms of compensation." However, since the payments in question are expressly included as "salary," we do not reach the question whether they might be considered "other forms of compensation."

Furthermore, the payments in question would not seem to constitute a pension or like "benefit." Rather, they would be in the nature of contributions. Consequently, it is our view that the amounts in question are included in the salary cap computation.

Inclusions of contributions to the 457(f) plan would, in our view, not be included, to the extent that the superintendent obtains no vested right thereto prior to termination. As noted above, however, such a plan would be authorized only to the extent that it meets the requirements for severance pay. To the extent that entitlement to the amounts contributed would vest in the superintendent prior to termination, it is our view that those amounts would, at the time of the vesting, be considered "salary" for purposes of the cap.

## FACTS

Many school districts provide to their superintendents "expense reimbursements" for the use of the superintendents' personal vehicles in addition to the mileage or monthly allowances authorized by Minn. Stat. § 471.665. These

"expense reimbursements" include payments for insurance, maintenance, fuel and other expenses. One district's superintendent's contract provides as follows:

"VI.  Transportation:

Pursuant to Minn. Stat. § 471.665, subd. 3, the School Board shall provide the Superintendent the monthly amount of $387.00 to compensate the Superintendent for business usage of his personal vehicle. All expenses for its operation, including insurance and maintenance, shall be borne by the School District."

You then ask the following question:

## QUESTION FIVE

Does a school district have the statutory authority to pay the insurance, maintenance, fuel, or other expenses of their superintendent's personal vehicle in addition to mileage or periodic reimbursement authorized by Minn. Stat. § 471.665?

## OPINION

We answer this question in the negative. Prior Opinions have clearly established our view that, absent specific statutory authority a political subdivision may not provide an officer or employee a vehicle for personal use or pay the costs associated with such a vehicle. See, e.g., Ops. Atty. Gen. 359b, October 24, 1989, 104a-9, December 28, 1994.

Minn. Stat. § 471.665 permits a mileage or periodic allowance to be paid to an employee for use of a personal automobile "in the performance of official duties."

We are aware of no statute authorizing any payments associated with employees' personal vehicles in addition to those authorized by section 471.665. See Op. Atty. Gen. 104a-9, December 28, 1994. Since the payments of all fuel, insurance, maintenance, etc., would underwrite both business and personal use, such payments would be unauthorized.

Furthermore, insofar as payments to an employee for use of a personal vehicle on official business are intended to reimburse the employee in part for personal expenses associated with

ownership and operation of such a vehicle, the payments you describe would result in

reimbursing the employee for expenses not incurred.

## FACTS

During the OSA's review of the superintendents' contracts, several contracts were discovered in which the superintendent received expense allowances. For example, one district's contract states as follows:

The Superintendent shall receive an allowance of $615.00 per month for general business related expenses not otherwise covered in this contract. Effective January 1, 1992 and each January thereafter, the allowance for the calendar year shall be increased by 3% per year.

Under this provision, the superintendent received a set payment of $615 or more each month. This amount was paid in addition to the Superintendent being reimbursed for other expenses under the superintendent's contract. There was no procedure under which the superintendent presented for reimbursement receipts or proved any claim for individual expenditures to be reimbursed by this particular allowance. The OSA determined that this monthly payment constitutes "salary" under Minn. Stat. § 43A.17, subd. 9.

You then ask the following question:

## QUESTION SIX

Must expense reimbursements paid to officers or employees of school districts be paid in accordance with Minn. Stat. § 471.38 and related provisions including § 471.391?

## OPINION

We answer this question in the affirmative. Minn. Stat. § 471.38 requires that any

account, claim or demand against a school district shall not be allowed until the person claiming

payment submits the claim, itemized to the extent possible, in writing, and signs a declaration

that the amount is just and correct, and that no part has been paid. This statute covers claims for

reimbursement of expenses, and payment of a claim is conditioned on an expense actually having

been incurred. See, e.g., Leskinen v. Pucelj, 262 Minn. 461, 115 N.W.2d 346 (1962) (claims of town officers for traveling expenses must be supported by specific showing of each expense incurred); Van Loh v. Waseca County, 265 N.W. 298 (Minn. 1936) (county school superintendent's claims for expenses must be itemized and verified).

On the other hand, if there is no requirement that an expense actually be incurred to trigger "reimbursement," then the only requirement for payment is that the employee be on the payroll. If that is the case, the payment is not an expense reimbursement, but salary.

## QUESTION SEVEN

Does a school district have the authority to pay an "expense allowance" without receiving receipts or proof of claim and exclude the amounts paid from the computation of salary under Minn. Stat. § 43A.17?

## OPINION

We answer this question in the negative. Minn. Stat. § 43A.17, subd. 9(3) only allows an exclusion from the calculation of total compensation for "actual expenses incurred" which have been reimbursed. Accordingly, for a reimbursement to qualify as an amount excluded from an employee's total compensation, it must have been reimbursed in accordance with Minn. Stat. § 471.38.

In the situation you describe, the superintendent's expense allowance is paid monthly, at a rate set by the contract, and escalates each year. It is paid in addition to the "Duty Related Expenses" reimbursed under another provision of the contract. It is not contingent upon the superintendent actually incurring any expenses, but merely being on the payroll. These characteristics demonstrate that the "allowance" is simply an escalating payment of salary.

A similar conclusion was reached in Op. Atty. Gen., 16lb-4, Jan. 24, 1989, which stated that any amount paid for a housing allowance was an element of salary authorized by the school

board's general authority to compensate its employees. That allowance was therefore included in the calculation of salary for purposes of applying Minn. Stat. § 43A.17, subd. 9.

## FACTS

Split dollar insurance arrangements allow an employer to fund the purchase of cash value insurance for an employee. Under a split dollar life insurance policy, the employer pays premiums, styled as advances. These premiums and the earnings they generate fund the provision of life insurance protection to the employee and, it appears, an accumulating cash value which the superintendent can obtain in lieu of death benefit upon terminating the policy prior to death. Such policies may also permit the owner to borrow against the cash value while the policy remains in force. The advanced premiums are ultimately repaid to the employer from the death benefit if the employee dies while the agreement is in effect. If the agreement terminates before the employee dies, the advanced premiums are repaid from the policy's cash value (assuming it is sufficient). However, during the intervening time, the school district has lost both the use of the funds and any return which could have been received if the funds had been invested.

One District agreed to pay for a $300,000 "split dollar life insurance agreement to provide life insurance protection for the Superintendent." This benefit was in addition to term life insurance. In response to an OSA inquiry concerning the split dollar life insurance policy, the District averred that the split dollar life insurance policy was a whole life insurance policy with ultimately "no cost to the School District." The school district also stated that, under the terms of the Agreement, the School District is ultimately fully reimbursed for its premium contribution. Further, the School District had the protection of a lien against the death benefit to fully reimburse the School District in the event of the untimely death of the superintendent.

Based upon these facts you present substantially the following question:

## QUESTION EIGHT

Does the split dollar life insurance policy have a cost to the school district that must be included in the computation of salary and other forms of compensation for the employee? If so, is the cost to the school district the annual premium payments paid by the school district or is some other method of cost valuation appropriate?

## OPINION

We answer the first part of this question in the affirmative. While Minn. Stat. § 43A.17, subd. 9(3) provides for an exclusion from total compensation for term life insurance, there appears no exclusion for the cost of other forms of life insurance including the "split dollar" insurance you have described. Thus, assuming the district is authorized to provide this type of insurance,[2] its cost must be included in computing compensation pursuant to Minn. Stat. § 43A.17, subd. 9.

While the matter is not entirely clear, it is our view the amount to be included as compensation is the amount of the premium paid by the district less any reimbursement actually received by the district in the year in which the premium is paid. Minn. Stat. § 43A.17, subd. 9 provides that "The value of other forms of compensation shall be the *annual cost* to the political subdivision" (emphasis added).

Thus, while the district may eventually recover part or all of the money paid out for the policy,[3] it is the "annual cost" rather than the net cost over the life of the policy that must be used in computing the value of compensation in any one year for purposes of applying this compensation limit. In that regard, it is our view that each year of the superintendent's contract must be considered separately without regard to the potential that all or part of the district's costs might be recovered at some indefinite future time. Consequently, for any year in which the district receives no reimbursement of the premium payments, the amount to be included in computing the superintendent's compensation would be the total premium paid by the district.

---

[2] Minn. Stat. § 471.61 authorizes school districts to insure or protect officers and employees: "under a policy ... or contract...of group insurance or benefits, covering life...." Absent other express statutory authority, this section defines this limit of the district's power to provide insurance for employees. See Lily v. City of Minneapolis, 527 N.W.2d 107 (Minn. Ct. App. 1995) To the extent that the policy described is not a group policy and provides for benefits in addition to a death benefit, it might be deemed outside the authority granted by the statute.

[3] It appears, however, that in the example presented, the district has waived any lien or claim against the superintendent for repayment of premiums paid by this district.

It might be argued that, where the district, in consideration for the premium payment, receives an absolute claim for repayment of the premium at an indefinite future date, the annual cost could, theoretically, be computed as the amount of the premium, less the present value of the lien against the death benefit or cash value for the amount of the premium as determined pursuant to actuarial and accounting tables. We disagree. Even if it were possible to value accurately the right to receive reimbursement at an uncertain future date, we think it is clear that the term "cost" does not imply any netting of the funds given against the value of property received.

## QUESTION NINE

Does the Commissioner of Children, Families and Learning have the authority to compel school districts' compliance with the compensation cap set forth in Minn. Stat. § 43A.17, subd. 9 either directly, by reducing a superintendent's salary, or indirectly, by withholding state school aids from a school district which is not in compliance with the compensation cap statute?

## OPINION

We answer in the negative. The general authority and responsibility for managing the affairs of a school district and for fixing the compensation lies in the school board. See, e.g., Minn. Stat. §§ 123.33 - 123.35. We are aware of no statutory authority for the Commissioner to modify, administratively, compensation fixed by the school board.

Likewise, we are not aware of any authority for the Commissioner to reduce state aids to districts for violations of the section 43A.17 limitations. There are a number of statutory violations for which the Commissioner is expressly directed to reduce aids. See, e.g., Minn. Stat. § 124.15. Transgressions of the salary cap, however, are not included.

Absent any such statutory authority, it is our opinion that the Commissioner is not empowered either to modify a superintendent's contract or to withhold state aids to which a district is otherwise entitled, pursuant to statute. See, e.g., Waller v. Powers Dept. Store, 343

N.W.2d 655, 657 (Minn. 1989) (administrative agency can only exercise power in manner

prescribed by legislative authority).

Very truly yours,

HUBERT H. HUMPHREY III
Attorney General

KENNETH E. RASCHKE, JR.
Assistant Attorney General

AG:20063 v1